STATE OF VERMONT
ENVIRONMENTAL COURT

|  | } |  |
|---|---|---|
| **In re: Armour Siding Application** | } | **Docket No. 134-7-05 Vtec** |
|  | } |  |

## Decision on the Merits

Peter Armour's request for a permit to replace the existing clapboard and wooden exterior of his multi-unit dwelling at 360–364 South Winooski Avenue came before this Court on his appeal of the denial of his application. The Court conducted a site visit and a bench trial, after which the parties were afforded the opportunity to submit proposed finings of fact and conclusions of law. Based upon the evidence admitted at trial and put into context by the site visit, and for all the reasons stated below, the Court concludes that Mr. Armour's application does not satisfy the applicable provisions of the Burlington Zoning Ordinance ("Ordinance") and denies his application.

Appellant Peter Armour ("Appellant') is represented in this proceeding by Attorney Allan W. Ruggles. The City of Burlington ("City") actively participated in this proceeding through its attorney, Kimberlee J. Sturtevant. No other party entered their appearance in this appeal.

## Findings of Fact

Based upon the evidence admitted at trial, including that which was put into context by the site visit, the Court makes the following findings of fact:

1.      Appellant owns the land and two buildings located at 360–364 South Winooski Avenue ("the Property"). The front building on Appellant's lot is the subject of the application under consideration in this appeal.

2.      The front building on Appellant's lot was built in 1927 and is of a Dutch Colonial design. It is a 3–4 story structure, originally built as a single family home. It now contains seven apartments.

3.      The rear building was originally built as a five-bay garage. It now contains four apartments. Improvements to the rear building and its current use are not at issue in this appeal.

4.      When Appellant purchased the Property 5–6 years ago, both buildings were in a state of disrepair and neglect. He first sought to renovate and repair the interior of both buildings. He

later repaired and painted the exterior of the rear building. He then investigated his options for repairing the exterior of the front building, which we will hereinafter refer to as the "main house."

5. Prior to purchasing the Property, Appellant did not research the limitations that the Ordinance would impose on the Property in general or on the main house in particular.

6. The main house is of Dutch Colonial design and has several unique design features, all made of wood, including distinctive moldings, cornish returns, turned columns and a variety of siding styles, ranging from 2½ inch clapboards to shingles cut in several shapes.

7. The main house was originally built by a prominent Burlington-area lumber dealer and has been commonly referred to as the George Jimmo House. It and the rear building, referred to as the George Jimmo Barn, are listed on the Burlington Register of Historic Resources as Historic Buildings # 2283 and 2284, respectively. City Exhibit 3. The main house is also listed on the Vermont State Register of Historic Resources.

8. Because of these designations, the main house is an "historic building" subject to the design review provisions of Ordinance § 3.2.3 ("Design Review District" designations) and Ordinance Article 6 ("Design Review" criteria).

9. The one block area in which the Jimmo House and Barn were built, particularly south of Spruce Street, was developed in the 1920s with homes of somewhat similar designs. The evidence reflects that several homes (i.e.: more than 3 and less than 12) of a similar design remain in the neighborhood today.

10. Properties that are within the jurisdiction of the Design Review District established by Ordinance § 3.2.3 must receive a "Certificate of Appropriateness" before any further development or improvements may occur. Ordinance § 6.1.4. Repairing, repainting, or replacing the exterior of a historic building must first receive a Certificate of Appropriateness under these Ordinance provisions before any such work commences.

11. Vinyl siding is often used throughout Vermont, including in Burlington, to replace wooden clapboards on residences. While vinyl siding often costs more initially to install on a home than repairing broken or rotted wooden clapboards and painting them, vinyl is more durable. It has a life expectancy of between ten and fifty years, depending upon the quality of the installation and the elements to which it is exposed. Repaired wooden clapboards can sometimes require repainting in as little as five years, depending upon the quality of the workmanship and the elements to which they are exposed. Experts for both parties testified to

2

these points at trial. On these general points, their testimony was credible and not in conflict. We adopt these general opinions and find them to be material to the pending appeal.

12. Advancements have been made in the manufacture of vinyl siding such that it can be produced in almost any color shade, texture and almost any width or thickness. Vinyl siding can be produced so that, when used on one side of a residence and when compared to an adjoining side finished with painted wooden clapboards, it is difficult for even an experienced contractor to distinguish the two without closely examining the two adjoining sidings.

13. The success of vinyl siding in being indistinguishable from painted wooden clapboards is most often achieved on homes that have straight, linear sides without distinctive moldings. When a home has distinctive wooden molding, it cannot easily be duplicated in vinyl. When homes with distinctive molding or other unique exterior features have vinyl siding installed, the moldings are often replaced or buttressed with the channeling system that is used to keep the ends of vinyl siding in place. The channel pieces make it much easier for even an inexperienced eye to discern that a home has vinyl siding.

14. Appellant's expert contractor testified at trial that he provided estimates of the expense and procedures needed to install vinyl siding on Appellant's main house. He would first remove all wooden clapboard and shingles. He expects that some repair and replacement may also be needed on the wood and other structural materials underneath the wooden clapboards, due to the rot, peeled paint and water damage now visible on the main house. He would also remove most, if not all of the distinctive moldings, cornish returns, and multi-sized shingles now on the main house. After this removal work is completed, the contractor would "wrap" the main house in a thin insulation, installed over the exterior of the structure, and upon which the vinyl siding and channeling systems would be placed.

15. The wooden turned columns on the front porch would remain and would be circled at the top and bottom by the channeling system that would hold the adjoining vinyl in place. The channeling systems would also be used in place of the wooden material used at the corner of each exterior wall.

16. Appellant proposes to install vinyl siding in a color similar to the color once visible on the painted wooden clapboards and trim pieces. The wooden clapboards are 2½ inches wide. The vinyl samples admitted at trial and represented to be accurate samples of the vinyl to be used on Appellant's main house were three inches wide. The distinctive moldings and cornish returns

would not be replicated in vinyl. The vinyl could also be produced to replicate some, but not all, of the variable shapes of shingles first installed and currently remaining on the main house.

17. The exterior of the main house suffers from many years of neglect, all predating Appellant's purchase of the Property. It is very likely that repair work will need to be completed on the wooden structure underneath the rotted or water-damaged wood clapboards, regardless of whether the main house is repainted or re-sided with vinyl. The photos admitted at trial and put into context by the site visit suggest that Appellant's main house may be the most severe example of neglected and peeling paint in the immediate neighborhood, but it does not represent the worst example of rotted wood or a water damaged exterior, as evidenced by photographs admitted at trial and as observed during the site visit. The exterior of Appellant's main house needs extensive repair and attention. But whether that comes in the form of repair and repainting, or installation of vinyl siding, the main house is not in such a state of disrepair that would preclude Appellant from using original siding materials.

18. Several homes in Appellant's neighborhood, including the home abutting his main house to the north, have vinyl siding installed on them. None of these examples were listed on either the Burlington Register of Historic Resources or the Vermont State Register of Historic Structures.[1]

19. None of the example homes in the vicinity of Appellant's Property that was shown to have vinyl siding had the historical significance of Appellant's main house, nor was any of similar Dutch Colonial design.

20. Of the homes shown to have vinyl or aluminum siding in the vicinity of Appellant's property (three vinyl and four aluminum, as shown on City Exhibit 7), none were shown to have obtained a zoning permit authorizing the installation of vinyl or aluminum siding. The undisputed trial testimony was that the DRB has not previously approved a vinyl siding permit application of a Historic Building.

## Discussion

There is no doubt that attention to the exterior of the main house will dramatically improve its beauty and value. The remaining question is whether the Ordinance permits the installation of vinyl siding. This question is a legal one that we now turn to address.

---

[1] A complete list of the homes on the Burlington Register of Historic Structures was not admitted at trial. However, several homes near Appellant's Property were listed on the same page as the main house. See Burlington Register of Historic Structures, page 376, admitted as City Exhibit 3 and listing structures at 356, 361 (dwelling and separate garage), 365 and 366 South Winooski Avenue.

This Court has jurisdiction to review, applying a de novo standard, the issues properly preserved for appeal. V.R.E.C.P. 5(g); see also In re Appeal of Jolley Assocs., 2006 VT 132, ¶9 (quoting In re Garen, 174 Vt. 151, 156 (2002)). In his Statement of Questions, Appellant presented the following three issues: whether his planned use of "high quality imitation wood grain vinyl siding to restore" the main house would (1) be permissible under the Ordinance generally; (2) be "inharmonious to the architecture of existing buildings" in its vicinity; or (3) "constitute[] a disruption of historic and traditional architectural features that are consistent within the neighborhood[.]" We address each of these issues below.

Burlington citizens have expressed their long-standing interest in preserving homes and other structures of historical significance by their adoption of Ordinance provisions that require careful attention to such resources. The Design Review District established by Ordinance § 3.2.3 is not limited to specific districts of the City, but also includes certain "major street corridors" and "Historic Buildings." Id.

Appellant's main house is an historic building, as are several other 1920s era homes in the neighborhood. Properties and structures falling within the Design Review District must satisfy the specific design review criteria of Ordinance Article 6. See Ordinance § 6.1.3. Ultimately, design review approval is determined by the City of Burlington Development review Board ("DRB"), but the DRB is assisted in this process by the Design Advisory Board ("DA Bd.") established by Ordinance § 6.1.6. The DRB is authorized to request advice and recommendations from the DA Bd., but is not mandated to follow the DA Bd.'s advice or recommendations. Id.

Here, the DRB sought the advice and recommendations of the DA Bd. when Appellant submitted his application to install vinyl siding on his main house. The DA Bd. submitted its recommendations to the DRB in writing; its recommendations were admitted into evidence at the de novo trial before this Court as City Exhibit 5.[2] After review of the applicable provisions in Ordinance Article 6, the DA Bd. voted unanimously to recommend denial of Appellant's vinyl siding application. The DRB referenced the DA Bd.'s recommendations, but recited its own determinations in denying Appellant's vinyl siding application in its decision of April 26, 2005.

As with the DRB before, this Court may take into consideration the DA Bd.'s advice and recommendations, but is not obligated to follow them. Chioffi v. Winooski Zoning Bd., 151 Vt.

---

[2] City Exhibit 5 is a memorandum to the DRB from Planning and Zoning Department staff member Mary O'Neil, who also testified at trial. The DA Bd.'s advice and recommendations were summarized in Ms. O'Neil's testimony and Exhibit 5.

9, 11 (1989) (in a de novo appeal, the court can consider all evidence which the zoning board was entitled to receive below). This Court is also guided in its analysis of Appellant's vinyl siding application and its compliance with Ordinance Article 6 by the Policy on the Application of Vinyl Siding & Substitute Façade Materials, adopted by the DRB on November 29, 1994 and admitted at trial as City Exhibit 6. This Policy specifically discourages the allowance of vinyl siding on structures that have been determined to still be validly listed on the State, national or Burlington Register of Historic Resources. Appellant's main house is still validly listed on the State and Burlington Register of Historic Resources.

Pursuant to the former 24 V.S.A. § 4407(6)[3], Ordinance § 6.1.10 lists specific criteria, ten in number, that guide our determination of whether a design review certificate of appropriateness should be granted. Appellant has preserved review under two of those criteria in this appeal.[4] We are first asked whether Appellant's proposed use of high quality imitation wood grain vinyl siding is inharmonious with the architecture of existing buildings in the vicinity, under the criteria articulated in Ordinance § 6.1.10(a), and second, whether his plan constitutes a disruption of the neighborhood's historic or traditional architectural features, under the criteria articulated in Ordinance § 6.1.10(i). In light of our factual findings, we answer both of these questions in the affirmative.

While we applaud Appellant's proposed use of high quality, wood grain vinyl siding and his on-going renovations to these valuable historic structures, the installation of vinyl siding on the main house, as outlined by Appellant's contractor, will disrupt important and distinctive characteristics that the Jimmo House illustrates and shares with other nearby structures of Dutch Colonial design. The production of vinyl siding has improved over the forty years since it was introduced to this area, particularly in the last ten years. However, the application of vinyl to this structure will necessitate the removal and destruction of important historic components that cause it to relate harmoniously with nearby structures.

If the subject property did not have these distinctive design features, including the distinctive moldings, cornish returns, and multi-sized shingles, vinyl siding might not have resulted in such a disruption and might have been permissible. This point was or should have

---

[3] 24 V.S.A. § 4407 was amended effective July 1, 2004; however, it remains in effect with respect to zoning ordinances adopted pursuant to its provisions prior to the amendment. See 24 V.S.A. § 4481.

[4] While Appellant listed three questions in the Statement he filed, his first question — whether he should be permitted to use vinyl siding under the current Ordinance — is of a more general nature and is encompassed within our discussion of the other two questions.

been clear to Appellant when he investigated the property prior to purchase. We regret the additional effort and expense, over the long term, that Appellant will face because he must use traditional painted materials in his renovations to the exterior of this structure, but the use of vinyl siding would result in the removal of the distinctive historic components of the Jimmo House and would cause a material disruption of the harmony exhibited by this neighborhood's historic and traditional architectural features.

## Conclusion

For all the reasons stated above, we conclude that Appellant's planned use of vinyl siding does not satisfy the criteria set forth in Ordinance §§ 6.1.10(a) and (i), is not otherwise in conformance with the applicable provisions of the Ordinance, and is therefore not entitled to a certificate of appropriateness under Ordinance Article 6. For these reasons, Appellant Peter Armour's application is **DENIED**. A Judgment Order accompanies this Decision.

Done at Berlin, Vermont this 18th day of December, 2006.


_____
Thomas S. Durkin, Environmental Judge